**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re ) | |
| ) | |
| Kashif Shan ) | Case No. 23-14552 |
| ) | |
| ) | Chapter 7 |
| ) | |
| Debtor. ) | |

**OBJECTION OF PETITIONING CREDITORS JEFFREY MONTALBANO, DALE TAKIO, AND TAKTIK ENTERPRISES, INC. TO DEBTOR KASHIF SHAN'S MOTION TO DISMISS INVOLUNTARY BANKRUPTCY PETITION**

Petitioning Creditors Jeffrey Montalbano, Dale Takio, and Taktik Enterprises, Inc. (together, the "Petitioning Creditors") hereby object to the Motion to Dismiss the Involuntary Petition (the "Motion" or "Mot.") filed by the Debtor, Kashif Shan ("Debtor" or "Shan"). In opposition, the Petitioning Creditors state as follows:

**PRELIMINARY STATEMENT**

The Petitioning Creditors filed the present Involuntary Petition as a matter of last resort. "Generally, involuntary bankruptcies are filed by creditors in cases of business mismanagement and in cases in which the potential debtor is transferring assets in anticipation of creditor lawsuits and/or proceedings because the involuntary filing can serve as a vehicle to prevent diminution of assets by an involuntary debtor and provide unsecured creditors with a more equitable treatment." *In re Colon*, 474 B.R. 330, 361 (Bankr. D.P.R. 2012).

These are the very concerns that precipitated the present filing. Shan is the former Chief Executive Officer and majority owner of Whole Hemp Company LLC, which formerly did business as "Folium Biosciences." At one point, Folium Biosciences was possibly the largest cannabidiol oil

("CBD Oil") extractor in the United States. The company was headquartered in Colorado Springs, where Shan also resides.

Now, Folium Biosciences is in a receivership that is about to wind up. Shan is the subject of multiple lawsuits concerning the millions of dollars that he and his wife took from the company in purported "dividends." Those lawsuits also allege that Shan has engaged in shell games to protect his assets – an allegation that is supported by the banking information obtained by the Petitioning Creditors in post-judgment discovery. It appears that Shan's games are continuing in the sworn declaration he submitted to the Court in which (contrary to his prior written submissions under oath) he claimed that he is no longer in Colorado and is no longer insolvent. He is continuing to try to run from creditors, just as he has for years.

In many ways, Shan presents a textbook case for an Involuntary Petition. The Petitioning Creditors are one of only two bona fide debts acknowledged by Shan as of the date of the filing of the Involuntary Petition, and thus have standing to pursue the petition. However, it is anticipated that there are or will be many more disputed creditors, given the lawsuits that are presently outstanding against him or likely to be filed. The appointment of a Chapter 7 Trustee will be critical both to marshalling assets and to ensuring that unsecured creditors are fairly treated in the recovery of fraudulent transfers and other proceeds. The Motion should be denied.

## BACKGROUND

### I.     The Lawsuits Filed By Petitioning Creditors.

Petitioning Creditors Takio and Montalbano are former executives of Folium Biosciences. At one time, each worked closely with Shan. Both alleged that they were promised equity in Folium Biosciences – even told that they had equity on the books and records – and then Shan duplicitously

attempted to remove that equity. *See* November 16, 2023 Declaration of David Olsky ("Olsky Decl.") ¶ 2 (Exs. 1 - 2) (complaints filed by Takio and by Montalbano).

The lawsuit filed by Takio also contained a derivative claim against Shan for breach of fiduciary duty against Shan for (among other things) taking millions of dollars in unearned distributions. Takio disclosed the expert report of Jeff George, CPA/ABV, which identified over $5.2 million in improper distributions taken out by Shan individually or through his wife through 2019.[1] Olsky Decl. ¶ 3; Ex. 3. This calculation was never seriously contested; no reports were filed contradicting this opinion. Olsky Decl. ¶ 4. Shan also produced a lengthy audio in which Folium Biosciences' then general counsel, Craig Brand, admitted to a third party that Shan and his wife had stolen millions of dollars from the company in so-called dividends. Olsky Decl. ¶ 5; Ex. 4 (transcript).

Notably, on August 9, 2019, Takio first served his demand on Shan via email from counsel. Olsky Decl. ¶ 6. On August 12, 2019 (the first business day after Shan received the demand), Shan had his primary residence of 3 Pine Road, Colorado Springs, Colorado transferred for zero dollars into a limited liability company called "Motu LLC," which on information and belief Shan also controls. Olsky Decl. ¶ 7. A recent property record search revealed that Motu LLC remains the owner of the 3 Pine Road property. Olsky Decl. ¶ 8; Ex. 5.

The Montalbano and Takio actions were consolidated for trial but delayed considerably due to COVID-19. Olsky Decl. ¶ 9. By the time that trial was scheduled to commence (January 24, 2022), Folium Biosciences was in severe financial distress. Olsky Decl. ¶ 10. On January 18, 2022,

---

[1] These calculations were based on the period at issue in the Takio case, and the books and records available to George at the time. On information and belief, substantial additional funds were taken by Shan and/or his wife after 2019.

and on February 22, 2022, the Parties to the suits – Montalbano and Takio, as plaintiffs, and Folium Biosciences, Shan, and Quan Nguyen, as defendants – agreed to a settlement whereby the defendants would make structured payments and would be jointly and severally liable in the event of default. Olsky Decl. ¶ 11; Ex. 6 and 14 (Settlement Agreement and Mutual Release).

On or around June 8, 2022, the defendants defaulted, and the state court subsequently entered consent judgments against the defendants jointly and severally in the amount of $550,000 in favor of Dale Takio and Taktik Enterprises, Inc., and in the amount of $230,000 in favor of Jeff Montalbano. Olsky Decl. ¶ 12. Shortly thereafter, Petitioning Creditors served Rule 69 interrogatories on Shan. Olsky Decl. ¶ 13. They had to seek substituted service because Shan would not allow process servers into his gated community. Olsky Decl. ¶ 14.

In his responses to the Rule 69 Interrogatories, Shan, under oath, disclosed that he had *de minimis* assets, no property, and no income. Olsky Decl. ¶ 15; Exs. 7 - 8 (interrogatories and responses). In response to Question #16 about his outstanding liabilities, Shan only identified two bona fide debts not subject to dispute: "The Defendant currently owes approximately $3 million to the Internal Revenue Service for back taxes within the past 3 years, which is a debt entitled to priority. Additionally, due to the consent judgment entered by the Court, the Defendant also has a judgment against him in this case." Olsky Decl. ¶ 16; Ex. 8 at 3. Shan also identified 3 Pine Road as his address.

The Petitioning Creditors attempted garnishments against bank accounts, attorneys and others where Shan purportedly had assets, but have not come close to satisfying the judgment. Olsky Decl. ¶ 17. The Petitioning Creditors also subpoenaed various banks for accounting information where Shan or his family was known to have accounts, including Bank of America, 5 Star Bank, Wells Fargo, and JP Morgan Chase. Olsky Decl. ¶ 18. The wire information produced by

4

Bank of America indicated that there were large dollar transfers to the bank account of Shan's wife in an account that was "POD" to Shan, after the judgment was entered, include a wire to the Bank of America account in the amount of $1,967,000 on July 5, 2022. Olsky Decl. ¶ 19.

While the Petitioning Creditors have been unsuccessfully attempting to collect on Shan's outstanding judgment, other parties have filed or threatened to file suit against Shan and his family for damages and/or fraudulent transfers. Two complaints and demands known to Petitioning Creditors are the following:

- GEM Private Equity Fund I and GEM Private Equity Fund II, who purport to be the secured lenders to Folium Biosciences, have filed suits in El Paso County District Court (Colorado) against Shan, family members and alleged affiliates for fraud and fraudulent transfers. Olsky Decl. 20; Ex. 9.
- After the filing of the Involuntary Petition, the Receiver for Folium Biosciences has filed an unopposed motion in Pueblo County District Court (Colorado) indicating that it will demand a capital contribution from Shan in the amount of nearly 50% of Folium Biosciences' outstanding debt (expected to be over $25 million). Olsky Decl. 21.

Thus, absent intervention by the Bankruptcy Court, at least six parties (the Petitioning Creditors, the Receiver, and GEM Private Equity Funds I and II) are seeking recovery from the same assets on similar theories in three separate courts. There may be other suits about which Petitioning Creditors are currently unaware. Further, absent intervention by the Bankruptcy Court, Shan will have the ability to continue to hide assets from creditors while the suits are ongoing.

    II.    **The Purported "Settlement" Discussions**

In the Motion, Shan submits that the Petitioner Creditors' judgment against him was "settled." This is yet another ruse. The El Paso County District Court *rejected* Shan's attempt to enforce a settlement agreement that he alone signed, and that rejection now precludes him from raising the issue a second time. For reference, the Petitioning Creditors' briefing on Shan's motion in state court is included, as it has an accurate version of the events surrounding Shan's so-called "settlement" of the Petitioning Creditors' judgment. Olsky Decl. ¶ 22; Ex. 10.

In a nutshell, in the fall of 2022, in an effort to stave off further garnishment proceedings, Shan had a new counsel reach out to undersigned counsel about settling his liability. Olsky Decl. ¶ 23. The Petitioning Creditors attempted in good faith for months to come to a resolution, only for Shan to change his mind after being given final documents to sign. Olsky Decl. ¶ 24. In particular, the Petitioning Creditors specifically sought representations from Shan, consistent with the representations of his counsel, that he would pay any settlement amount prior to the judgment being marked satisfied, and that Shan would use proceeds that would not be subject to fraudulent transfer suits by other parties. Olsky Decl. ¶ 25. Instead, Shan sent back to the Petitioning Creditors a completely different settlement agreement (signed only by him) that would allow Shan to reduce his potential liability without first providing payment, that represented he was insolvent, and that removed any penalties for failing to make timely payment of the reduced judgment. Olsky Decl. ¶ 26. In other words, the "settlement" would just reduce the amount that Shan owed on the outstanding judgment to Petitioning Creditors, while putting off the payment of consideration to another day (most likely never). Olsky Decl. ¶ 27. Petitioning Creditors would not agree to this revision and called off the settlement discussions. Olsky Decl. ¶ 28.

Shan then filed a motion in state court attempting to enforce a "settlement agreement" that only he signed. Olsky Decl. ¶ 29. In doing so, his counsel attached email communications between

counsel in which all of Petitioning Creditors' objections were blacked out. Olsky Decl. ¶ 30. On April 28, 2023, the state court rejected Shan's attempt to enforce the agreement, although it ordered mediation. Olsky Decl. ¶ 31; Ex. 11. The state court's rejection of Shan's attempt to enforce the settlement agreement precludes Shan from attempting to enforce it here. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147 (2015) ("[T]he determination of a question directly involved in one action is conclusive as to that question in a second suit. The idea is straightforward: Once a court has decided an issue, it is forever settled as between the parties, thereby protecting against the expense and vexation attending multiple lawsuits, conserving judicial resources, and fostering reliance on judicial action by minimizing the possibility of inconsistent verdicts. In short, a losing litigant deserves no rematch after a defeat fairly suffered.") (citations and internal punctuation omitted).

Five months passed and Shan took no steps to mediate the issue, despite having asked for the opportunity. Olsky Decl. ¶ 32. On October 6, 2023, shortly before a status report was due to state court, on October 6, 2023, Shan's counsel filed a motion to withdraw, citing a conflict of interest. Olsky Decl. ¶ 33; Ex 12. In the motion to withdraw, Shan's counsel identified the 3 Pine Road address as the only address by which to contact Shan. *Id.* The Petitioning Creditors filed the Involuntary Petition the same day.

## ARGUMENT

Shan raises four arguments in favor of dismissing the Involuntary Petition. None have merit.

### I. Shan Was Properly Served.

Shan first argues that he was not properly served with the Involuntary Petition. Mot. at 2. In his declaration accompanying the Motion, Shan acknowledges that the summons and petition were served by mail to 3 Pine Road, Colorado Springs, Colorado 80906 in accordance with F.R.B.P.

7

1010(a) and 7004(b), but asserts that he does not reside at that address and that he does not regularly conduct business or profession there. Declaration of Kashif Shan in Support of Motion to Dismiss Involuntary Bankruptcy Petition of Jeff Montalbano, Dale Takio, and Taktik Enterprises, Inc. ("Shan Decl.") ¶¶ 3-5.

Shan's assertion in this Declaration, however, is completely contrary to the Rule 69 Interrogatory Responses that he submitted to the Petitioning Creditors, which he also signed under oath, and which he has never updated. In Colorado state court, such interrogatory responses are binding judicial admissions and cannot be subsequently contradicted. *See Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 2021 COA 143, ¶ 33, *cert. denied,* 22SC24, 2022 WL 4238209 (Colo. Sept. 12, 2022).

Shan's assertion is also contrary to the representation made by his attorney in state court *on the day of the filing of the Involuntary Petition* that further filings in the state court case should be sent to the 3 Pine Road address. And Motu LLC – the company to which Shan transferred his house upon receiving a derivative demand from Petitioner Takio – is still registered as the owner of 3 Pine Road.

The Colorado Secretary of State's records further confirm that Shan is continuing to do business at this address. Shan reported in response to Interrogatory 6 on his Rule 69 Interrogatory Responses that "KQ Investments, LLC is holding a K-1 interest in future profits for the benefit of the Defendant." The headquarters for KQ Investments LLC has been registered with the Colorado Secretary of State as 3 Pine Road. Olsky Decl. 34; Ex. 13.[2] As such, 3 Pine Road is a place at which Shan "regularly conducts a business or profession." F.R.B.P. 7004(b)(1). The Court may take judicial notice of this public record. *See* F.R.E. 201.

---

[2] The entity is apparently delinquent in its reporting as of October 1, 2023.

8

In sum, Shan's assertions in his declaration about his current address should be disregarded as a sham. Shan has resided at the address for years, albeit with a company (which on information and belief he controls) as the official owner. He also regularly conducts business at the address. He should not pretend he does not live or do business there to avoid service.

## II. Venue Is Proper In Colorado

Shan similarly contests venue in this Court under 28 U.S.C. § 1408. Mot. at 3-4. Shan asserts in his declaration that he has not been a Colorado resident in the last 180 days, does not intend to become a resident, does not have assets or a principal place of business in Colorado. Shan Decl. ¶¶ 6-7. As said, these assertions are belied by the binding statements that Shan made under oath in the Rule 69 Interrogatory Responses that he resides at 3 Pine Road in Colorado Springs, the fact that Motu LLC continues to own his house at 3 Pine Road, the representation of Shan's attorney to the state court that Shan may be served at 3 Pine Road in Colorado Springs, and the fact that Shan owns a business (KQ Investments) that is registered with the Colorado Secretary of State to operate out of that address. *See* Part I *Supra*.

Further, Shan has waived any right to challenge jurisdiction or venue of the Court. Pursuant to Paragraph 20 of the Parties' January 22, 2022 Settlement Agreement and Mutual Release, Shan agreed as follows:

> Jurisdiction and Venue. The Parties agree that the state and federal courts located in Denver County, Colorado shall have exclusive jurisdiction over any and all disputes relating to or arising from this Agreement.

This forum selection clause "is presumptively valid and must be enforced unless the party seeking to avoid the agreed-to forum demonstrates that enforcement would be unreasonable under the circumstances." *In re D.E. Frey Grp., Inc.,* 387 B.R. 799, 804 (D. Colo. 2008) (requiring that the Bankruptcy Court enforce a forum selection clause). The Involuntary Petition is a dispute that both

"arises from" and is "relating to" the Settlement Agreement and Mutual Release, as it concerns the collection of the debt owed by Shan under the agreement. Thus, the *only* proper venue for this dispute is the present Court.

### III. Petitioning Creditors Have Standing To File The Involuntary Petition

Referring to 11 U.S.C. § 303(b), Shan argues that the Involuntary Petition is improper because the Petitioning Creditors hold two claims and "[t]o the best of my knowledge, I have more than twelve holders of claims against me and my bankruptcy estate." Mot. at 5-6; Shan Decl. ¶¶ 9-11.

11 U.S.C. § 303(b) provides as follows:

> **(b)** An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> **(1)** by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $18,600 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> **(2)** if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $18,600 of such claims

11 U.S.C.A. § 303.

Again, Shan's assertion in his declaration is belied by his prior binding testimony under oath in response to the Rule 69 Interrogatories. It may be that Shan has more than 12 "claims" that are *disputed* and *contingent* claims (such as those claims being litigated by GEM Private Equity Funds I and II, and that are likely to be filed by the Folium Biosciences Receiver).

10

For the purposes of establishing standing under 11 U.S.C. § 303, however, the Court may only consider claims that are not contingent as to liability or the subject of a bona fide dispute. In response to Interrogatory 6, Shan previously testified that there were only three *undisputed* and *non-contingent* claims – *i.e.*, claims by the IRS and the Petitioning Creditors. We are not aware of any other undisputed non-contingent claims, and Shan has cited to none. The standing of the Petitioning Creditors depends on the date of the filing of the Petition; Shan should not be permitted after the fact to decide more than 12 claims are undisputed in order to avoid the involuntary petition. *Cf. Bartmann v. Maverick Tube Corp.,* 853 F.2d 1540, 1544 (10th Cir. 1988) ("A bankruptcy court determines the number of petitioning creditors filing an involuntary bankruptcy petition on the date that the petition is filed.").

The Petitioning Creditors thus have standing to file the Involuntary Petition under 11 U.S.C. § 303(b)(2). That is, as of the date of the Involuntary Petition, there were fewer than 12 holders of noncontingent debts not subject to a bona fide dispute. As holders of at least two such claims, the Petitioning Creditors have standing to file the Petition. And if Shan identifies additional noncontingent unsecured creditors, they may join with the Petitioning Creditors to seek relief. 11 U.S.C. § 303(c).

Shan also declares that he is "generally paying my debts as they become due . . . ." Shan Decl. ¶ 12. Whether Shan is generally paying his debts as they come due is an issue for trial, not a motion to dismiss. *See* 11 U.S.C. § 303(h)(1). It is nonetheless difficult to imagine that Shan would be able to establish he is paying these undisputed debts when he has neither satisfied the judgments nor the IRS claim, and he has reported having virtually no assets to do so.

Shan cites to the purported post-judgment settlement agreement that he alone signed as the basis to show that he can pay his claims as they come due. Mot. at 7. Those discussions may not be

11

used at trial to establish his purported willingness to pay his debts as they come due (if such willingness were even relevant). *See* Fed. R. Evid. 408. Even so, in the very settlement document that Shan seeks to improperly enforce here, he verified in the "Recitals" section that he was insolvent. *See* Shan Decl. Ex. 1 at 11 ("As a result of his insolvency, the Defendant defaulted on both agreements.").

### IV. The Court Should Not Abstain From Hearing The Petition Under 11 U.S.C. § 305.

Shan also asserts that the Court should dismiss the case pursuant to its discretion under 11 U.S.C. § 305. "The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal." *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) (citation omitted).

The burden of proof to obtain this extraordinary remedy is on the movant. *In re Sky Country Estates, LLC,* 17-11617-TL7, 2018 WL 3872109, at *3 (Bankr. D.N.M. Aug. 13, 2018). A motion can be granted on this ground only after "notice and a hearing." 11 U.S.C. § 305(a).

Contrary to Shan's assertion of a "four-part test," the District Court in *In re Spade*, 269 B.R. 225, 228, actually held that "bankruptcy courts must look to the facts of each individual case." As such, "a bankruptcy court is not bound by a prescriptive template; it may consider any factors it deems relevant to the determination of whether it is in the best interests of the parties to the suit to seek dismissal. Reasoned judgment based on articulated facts is the only test which the statute itself requires." *Id.* The District Court affirmed the Bankruptcy Court's consideration of the four factors

12

under an abuse of discretion standard; it did not suggest that this Court is cabined to a particular four-factor test. *Id.* at 228-29.

Some factors that Courts consider include:

a. The motivation of the parties;
b. Whether the bankruptcy court of the state court can better serve the interests of the creditors;
c. The detriment of the bankruptcy proceeding to the debtor;
d. Economy and efficiency of administration;
e. Whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
f. Whether federal proceedings are necessary to reach a just and equitable solution;
g. Whether there is an alternative means of achieving an equitable distribution of assets;
h. Whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
i. Whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time-consuming to start afresh with the federal bankruptcy process;
j. The purpose for which bankruptcy jurisdiction is sought;
k. Fairness;
l. Priorities in distribution;
m. Capacity for dealing with frauds and preferences;
n. Speed;
o. Economy;
p. Freedom from litigation;
q. Important of a discharge to the debtor; and
r. Complexity of the bankruptcy process

*In re Sky Country Estates, LLC*, 2018 WL 3872109, at *4–5.

On the whole, these factors counsel strongly against abstention. The Petitioning Creditors are seeking to have a single forum in which all of the fraudulent transfer actions are decided in a single forum, with distribution among all potential claimants per their pro rata share. Otherwise, it is a race among creditors to get the assets that Shan fraudulently transferred. It is also the most efficient way to resolve duplicative fraudulent transfer claims.

The bankruptcy process is also the most fair means by which to collect the assets available from Shan for distribution to unsecured creditors. Absent this centralized process, the creditors with the largest resources to pursue these claims (such as the GEM Private Equity Funds) will benefit at the expense of unsecured creditors without similar means (such as the Petitioning Creditors). By having a Chapter 7 Trustee instead pursue the claims on behalf of the entire estate, all unsecured creditors benefit, not just a few.

The Petitioning Creditors have already done much of the legwork for a Chapter 7 Trustee by obtaining key banking information, among other things, and will gladly share that information with a Trustee. Based on the information collected to date, a Trustee should be able to obtain compensation for his or her efforts via transfer and preference claims.

Contrary to Shan's assertions, *In re Spade* is inapposite. This is not a situation in which the Petitioning Creditors are seeking an advantage in an ongoing litigation or to have the Trustee obtain discovery for the Petitioning Creditors. The Petitioning Creditors have no ongoing litigation with Shan, and even their collection efforts are at an end. There is no discovery to take in that action; the Petitioning Creditors intend to provide the Trustee with the information and documents that they have received so as to avoid duplicative efforts.

Further, there is no alternative process to bankruptcy in these circumstances. Although the Petitioning Creditors and the other potential claimants are in state court, there is no remedy available to marshal all of the claims of all of the creditors and distribute them in order of priority. It is a race to the assets, in which only those creditors with the most resources will win.

There is no undue prejudice to other creditors. In *In re Spade*, the prejudice came from the effect that a bankruptcy would have on creditors who were receiving regular payments. 269 B.R. at

229. Here, a bankruptcy would not interfere with payment, as Shan has admitted that he cannot pay his creditors.

At bottom, unlike *In re Spade,* this is not merely a two party dispute. Shan has admitted to at least one other bona fide creditor (the IRS), and any and all creditors will need to bring the same fraudulent transfer actions to obtain payment on the amounts owed to them by Shan. Neither the creditors nor the debtor's interest would be served by an alternative, and Shan cannot carry his burden to obtain the extraordinary remedy of abstention.

### V.     The Court May Not Take Judicial Notice of the Contents of the Filings In State Court

Finally, Shan requests that the Bankruptcy Court take judicial notice of his filings in state court, and the state court's order of mediation. *See* Request for Judicial Notice in Support of Motion to Dismiss Involuntary Bankruptcy Petition on Jeff Montalbano, Dale Takio, and Taktik Enterprises, Inc.

Although a Court may take judicial notice of its own files and those of other courts, "the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1265 (10th Cir. 2006). Thus, the Court may take judicial notice of the fact that Shan filed a motion to enforce a purported settlement agreement in state court, and that the state court refused to grant that motion, ordering the parties instead to mediation. The Court may not take judicial notice of any of Shan's assertions within those documents. Such notice would be particularly inappropriate given that Shan or his counsel blacked out all of the Petitioning Creditors' objections to the purported settlement that Shan was attempting to enforce.

15

The Request also refers to Federal Rule of Evidence 408(b), which would allow the Court to consider these settlement communications for a purpose other than proving or disproving the validity of a claim or to impeach a witness. Whether the Court may consider these communications in such a context will need to await trial. However, it appears that the very purpose of filing these communications is for the Court to conclude that Shan's claims are valid and/or to impeach the Petitioning Creditors. The Court should reject this entreaty.

## **CONCLUSION**

For the reasons stated herein, the Motion should be denied.

DATED this 16th day of November, 2023.

Respectfully submitted,

FORTIS LAW PARTNERS LLC

*s/ David F. Olsky*
David F. Olsky, Atty. Reg. #46694
Fortis Law Partners LLC
1900 Wazee Street, Suite 300
Denver, CO 80202
Phone: (303) 295-9700
Fax: (303) 295-9701
dolsky@fortislawpartners.com
*Attorney for Creditors*

16

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 16, 2023, I electronically filed the foregoing **OBJECTION OF PETITIONING CREDITORS JEFFREY MONTALBANO, DALE TAKIO, AND TAKTIK ENTERPRISES, INC. TO DEBTOR KASHIF SHAN'S MOTION TO DISMISS INVOLUNTARY BANKRUPTCY PETITION** with the Clerk of the Court using the CM/ECF system and via First Class Mail to the following:

C. Alex Naegele
A Professional Law Corporation
19925 Stevens Creek Blvd, Suite 100
Cupertino, CA 95014
Tel: (408) 883-8994
Email: alex@canlawcorp.com

*Attorney for Debtor Kashif Shan*

                                        *s/Anastasiya Karant*
                                        Anastasiya Karant
                                        FORTIS LAW PARTNERS LLC